Susan LEE, Respondent,

v.

**FRESENIUS MEDICAL CARE,
INC., Appellant.**

No. A05–1887.

Supreme Court of Minnesota.

Nov. 15, 2007.

Sandro Garofalo, Marko J. Mrkonich, Littler Mendelson, Minneapolis, MN, for Petitioner.

Don L. Bye, Shelly M. Marquardt, Duluth, MN, for Respondent.

Robert R. Reinhart, Melissa Raphan, Dorsey & Whitney, Minneapolis, MN, for Amicus Curiae Minnesota Employment Law Council.

Joseph G. Schmitt, Matthew E. Johnson, Mark J. Girouard, Halleland Lewis Nilan & Johnson, Minneapolis, MN, for Amicus Curiae Minnesota Chamber of Commerce.

## OPINION

ANDERSON, Paul H., Justice.

In August 2004, Susan Lee filed a claim in Saint Louis County Conciliation Court, alleging that her former employer, Fresenius Medical Care, Inc., failed to compensate her for paid time off that she had earned and was entitled to receive upon Fresenius's termination of her employment. The conciliation court ordered Fresenius to pay Lee for the paid time off plus fees and then granted Fresenius's motion for appeal and removal to district court. The district court granted summary judgment in favor of Fresenius. Lee then appealed to the Minnesota Court of Appeals, which reversed the district court, concluding that under Minn.Stat. § 181.13(a) (2006), Fresenius was obligated to compensate Lee for the paid time off she had earned up to the time her employment was terminated. We reverse.

In December 1991, respondent Susan Lee began working as a dialysis patient care technician for Miller–Dwan Hospital's dialysis unit in Duluth, Minnesota, and she continued in that position when appellant Fresenius Medical Care, Inc., purchased Miller–Dwan's dialysis unit in September 2000. Fresenius operates a dialysis clinic, which treats patients with injured or diseased kidneys. Dialysis is a means by which a patient's blood is filtered through a machine to remove water and waste, a process that aids the kidneys in performing their normal function. As a patient care technician for Fresenius, Lee's re-

sponsibilities included assisting registered nurses with pre- and post-dialysis patient assessments and monitoring and documenting dialysis treatment parameters.

Around the time Lee's employment with Fresenius began, Fresenius issued a copy of its employee handbook to Lee, and she signed an acknowledgement form that she received the handbook. The employee handbook issued to Lee offered vacation pay, or paid time off,[1] on the following terms:

The Paid Time Off (PTO) program allows you [employee] to receive paid time off based on individual preferences and varying needs. * * * You accrue PTO hours at a set rate per pay period. Your accrual depends on your length of service and number of hours worked. * * *

New full-time employees begin to earn PTO upon hire at a rate of 7.69 hours per pay period (200 hours, or 5 weeks per year). PTO accrual is pro-rated for part-time employees. * * *

* * * *

PTO may be requested and scheduled at any time during the year. Approval of requests will be based on the timeliness of your request, authorization by the appropriate supervisor, and the needs of the department.

Lee was paid every two weeks, and based on her number of years worked and the 30 hours worked per week, she accrued 8.08 hours of paid time off per pay period at the time her employment with Fresenius was terminated.

The employee handbook provides that an employee who resigns will be paid for earned but unused paid time off if she gives proper notice, but the handbook specifies that an employee who resigns without giving proper notice or who is terminated for misconduct will not be eligible for payment of earned but unused paid time off:

An employee who gives proper notice * * * is eligible to be paid for earned but unused Paid Time Off (PTO). Unless otherwise required by state law, if you do not give acceptable notice, you may not be paid for earned but unused PTO, and you may not be considered eligible for re-employment. In addition, *if your employment is terminated for misconduct, you will not be eligible for pay in lieu of notice or payment of earned but unused PTO unless required by state law.*

(Emphasis added.)

On August 13, 2002, Fresenius terminated Lee for what was described as a "pattern of behavior," which resulted in "performance and patient safety issues." Fresenius cited six incidents, occurring between June 6, 2002, and August 8, 2002, that led to its decision to terminate Lee. Fresenius provided documentation for the six incidents.

The first incident report cited Lee for her failure to immediately report a broken valve in the "water room," necessitating an "emergency type procedure" whereby patients were temporarily removed from their dialysis machines. When Lee's supervisor confronted Lee about the incident, Lee reportedly stated that "she didn't want to get yelled at if she told." The second incident report cited Lee for her failure to immediately take a patient off a dialysis machine after the patient reported cramping. Lee reportedly failed

---

1. The parties use the terms "paid time off" and "vacation pay" interchangeably. Because Fresenius's employee handbook refers to "paid time off," we use that term more frequently in this opinion, but to the extent that the lower courts and cited case law use the term "vacation pay," we do not distinguish between these terms.

to inform the on duty registered nurse about the patient's cramping.

The third incident report cited Lee for her failure to take proper precautions to protect patients from colds when she coughed in the vicinity of patients without wearing a mask or using a tissue. The report indicates that Lee wore a mask while engaging in direct patient care but failed to do so at other times, although according to the report, Lee alleged that she covered her mouth with her hand. After being warned that she was to either cover her mouth with a mask or tissue, Lee was reportedly seen coughing later that same day without covering her mouth.

The final three reported incidents all occurred on the same day. First, Lee reportedly failed to wear proper protective attire, consisting of an apron and face mask, when putting a client onto a dialysis machine. Lee allegedly claimed that the protective attire was too hot. Second, Lee was cited for unnecessarily requesting assistance from her supervisor due to concerns with a patient. Lee's supervisor apparently concluded that the situation had not been urgent. The final incident report cited Lee for offering a patient a bag of wild mushrooms, which her supervisor determined might be unsafe for the patient.

Lee states in an affidavit that before she received the six discipline citations in the summer of 2002, she had "earn[ed] the highest of ratings and compliments for her work." She further states that things changed in 2002 because she "became interested and involved in unionizing her work group." Lee now alleges that after beginning her union activities, management began to harass her and charge her with the disciplinary citations, which ultimately led to her termination.[2] Lee states that after her termination, she was compensated for her accumulated hourly wages but not her accumulated paid time off.

In August 2004, approximately two years after her termination, Lee filed a claim in Saint Louis County Conciliation Court, seeking to recover pay in lieu of vacation time, or paid time off, that she had earned but had not used before her termination. Lee alleged that she had accrued 181.86 hours of paid time off, worth $3,011.60. The conciliation court ordered judgment in favor of Lee, awarding her $5,053.80, which included the paid time off compensation demanded by Lee and a statutory penalty imposed for Fresnius's failure to pay within 24 hours of Lee's demand. Fresenius appealed the conciliation court's order, and the conciliation court granted Fresenius's motion for appeal and removal to Saint Louis County District Court.

Fresenius and Lee filed cross-motions for summary judgment, and the district court granted Fresenius's motion and denied Lee's motion. The court noted that under Minn.Stat. § 181.13 (2006), an employer is obligated to compensate an em-

---

2.  Lee alleges on appeal that there is a genuine issue of material fact as to whether she was terminated as a result of her union activity and not because of any misconduct or just cause. At a district court hearing on the parties' cross-motions for summary judgment, Fresenius alleged that Lee had initiated proceedings before the National Labor Relations Board and that Lee's complaint was dismissed because the administrative body determined there was no basis for the complaint.

We find no evidence in the record regarding the union issues or bases for termination that were properly before the district court on the summary judgment motion other than the two statements in Lee's affidavit that she had earned high ratings for her work and then became involved in union activities. We note the parties' disagreement only insofar as it informs Lee's argument on appeal that she was wrongfully terminated.

ployee for vacation pay if the employee meets the eligibility requirements. The court concluded that eligibility requirements are determined by the employment contract between the employer and the employee. The court found that the employee handbook provision that made terminated employees ineligible for earned but unused paid time off met the criteria necessary to constitute a binding employment contract. Therefore, the court granted Fresenius's motion for summary judgment, concluding that Fresenius was not contractually obligated to compensate Lee for the paid time off after she was terminated for misconduct.

Lee appealed the district court's order to the court of appeals, which reversed the district court. *Lee v. Fresenius Med. Care, Inc.,* 719 N.W.2d 222, 223 (Minn. App.2006). The court of appeals noted that under section 181.13(a), an employer must compensate a terminated employee for wages earned but unpaid at the time of discharge, and Minnesota case law has determined that unused vacation pay constitutes "wages" for purposes of the statute. 719 N.W.2d at 224. The court of appeals agreed with the district court that "an employer's liability for an employee's vacation pay is wholly contractual," but the court of appeals stated that the district court "fail[ed] to recognize the principle that '[a] party cannot provide by contract what is prohibited by statute.'" *Id.* at 225 (quoting *Winnetka Partners Ltd. P'ship v. County of Hennepin,* 538 N.W.2d 912, 914 (Minn.1995)).

The court of appeals concluded that section 181.13(a) requires an employer to compensate an employee for accrued but unused vacation time, and therefore the provision in Lee's contract that made employees terminated for misconduct ineligible for paid time off is legally ineffective. 719 N.W.2d at 226. The court of appeals then reversed the district court's order, concluding that the terminated-for-misconduct provision in the handbook cannot be legally enforced. *Id.* We granted Fresenius's petition for review.

## I.

Lee asks us to interpret her employment agreement with Fresenius in light of section 181.13(a) and determine whether she is entitled to payment in lieu of the paid time off that she alleges she earned. On appeal from summary judgment, we determine whether there are any genuine issues of material fact and whether the district erred in applying the law. *Isles Wellness, Inc. v. Progressive N. Ins. Co.,* 703 N.W.2d 513, 516 (Minn.2005). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *Hickman v. SAFECO Ins. Co. of Am.,* 695 N.W.2d 365, 369 (Minn.2005). Lee also argues that if we conclude that she is not entitled to payment in lieu of the paid time off in dispute, then she is entitled to a trial on the issue of whether she was wrongfully terminated.

We first consider whether Lee is entitled to payment in lieu of her paid time off. Fresenius argues that based on Minnesota case law, section 181.13(a) permits an employment agreement between an employer and its employees to define when wages are earned. Fresenius further argues that because Lee was terminated for misconduct, the terms of the employment contract make her ineligible for payment in lieu of paid time off. "Contract interpretation is a question of law which we review de novo." *Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 271 (Minn.2004). Statutory construction is also a legal issue reviewed de novo. *Vlahos v. R & I Constr. of Bloomington, Inc.,* 676 N.W.2d 672, 679

(Minn.2004). When construing statutes, we attempt "to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2006). We construe statutes to effect their essential purpose but will not disregard a statute's clear language to pursue the spirit of the law. *Eischen Cabinet Co. v. Hildebrandt*, 683 N.W.2d 813, 815 (Minn.2004).

*Can an Employment Agreement Govern Eligibility for Paid Time Off?*

■ Before we determine what effect, if any, section 181.13(a) has on Lee's eligibility for payment in lieu of paid time off, we must determine whether an employment agreement may govern an employee's eligibility for paid time off, and if so, whether a valid employment agreement existed between Fresenius and Lee. Fresenius argues that an employee's eligibility for paid time off is governed by the employment agreement between the employer and its employee. In *Tynan v. KSTP, Inc.*, we noted that "liability as to vacation-pay rights is wholly contractual." 247 Minn. 168, 177, 77 N.W.2d 200, 206 (1956). The court of appeals reached a similar conclusion in *Brown v. Tonka Corp.*, stating that "[a]n employer's liability for employees' vacation pay is wholly contractual." 519 N.W.2d 474, 477 (Minn.App.1994) (citing *Tynan*, 247 Minn. at 177, 77 N.W.2d at 206). We conclude that the rule articulated in *Tynan* and cited in *Brown* is not in conflict with Minnesota statutes, which do not provide for employee vacation pay as of right. Accordingly, when employers choose to offer paid time off as a benefit, employers and employees can contract for the circumstances under which employees are entitled to paid time off and payment in lieu of paid time off, so long as the contract provisions are not prohibited by or otherwise in conflict with a statute.

*Did an Enforceable Employment Contract Exist Between Fresenius and Lee?*

■ We next determine whether an employment contract existed between Fresenius and Lee. Fresenius asserts that its employee handbook is an enforceable, unilateral employment contract with its employees. We have previously articulated the circumstances under which an employee handbook may constitute a binding unilateral employment contract. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 625–27 (Minn.1983). In Pine River, we said the terms in an employee handbook constitute a contractual offer if those terms are definite in form and are communicated to the employee through dissemination of the handbook. *Id.* at 626. Once a handbook is received by an employee, "[t]he employee's retention of employment constitutes acceptance of the offer," and "by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer." *Id.* at 626–27.

The employee handbook at issue here was received by Lee, evidenced by her acknowledgment that she received the handbook. Further, Fresenius retained Lee after she received the handbook and Lee continued on the job for almost two years, until her termination. We conclude that Fresenius's employee handbook constitutes an enforceable employment contract between Fresenius and Lee. Therefore, we conclude that the parties are bound by the terms of the handbook to the extent that they are valid under Minnesota law.

Under the terms of Lee's employment contract with Fresenius, Lee is not entitled to payment in lieu of her paid time off because the terminated-for-misconduct provision in the employment contract explicitly makes Lee ineligible for payment. The employment contract only makes em-

ployees eligible for payment in lieu of paid time off if an employee resigns with proper notice, which condition Lee could not meet because she was terminated for misconduct. Importantly for our analysis, Lee neither asserts that Fresenius breached its employment contract, nor claims that the terms of the employment contract entitle her to payment in lieu of paid time off.

*Is Paid Time Off "Wages" for Purposes of Section 181.13(a)?*

■ Because Lee acknowledges that Fresenius did not violate the employment contract, she essentially makes a statutory rather than a contractual argument. She argues that notwithstanding the terms of her employment contract with Fresenius, she is entitled to payment in lieu of her paid time off because the terminated-for-misconduct provision in the employment agreement is invalid under Minn.Stat. § 181.13(a). Section 181.13(a) provides:

> When any employer employing labor within this state discharges an employee, the wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee. If the employee's earned wages and commissions are not paid within 24 hours after demand, whether the employment was by the day, hour, week, month, or piece or by commissions, the employer is in default. The discharged employee may charge and collect the amount of the employee's average daily earnings at the rate agreed upon in the contract of employment, for each day up to 15 days, that the employer is in default, until full payment or other settlement, satisfactory to the discharged employee, is made.

Lee asserts that her paid time off constituted "wages" under section 181.13(a), and because she has "actually earned" her paid time off, she must be compensated for that paid time off.

The legislature has not specifically defined the term "wages" for purposes of Minn.Stat. § 181.13(a). Therefore, the first step in this part of our analysis is to determine whether paid time off, or vacation pay, constitutes wages for purposes of section 181.13(a). In *Tynan,* we did not decide the issue of whether paid vacation time is part of an employee's wages in Minnesota because it was unnecessary for resolution of the issues presented in that case. 247 Minn. at 176, 77 N.W.2d at 205. But we did observe that prevailing case law from other jurisdictions concludes that paid vacation time is part of an employee's wages and not a gratuity. *Id.* at 177, 77 N.W.2d at 206; *see also Kohout v. Shakopee Foundry Co.,* 281 Minn. 401, 403–04, 162 N.W.2d 237, 238–39 (1968) (noting that the Second Circuit Court of Appeals concluded that wages included vacation pay and applying the statute of limitations applicable to wage claims to claims for vacation pay); 19 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 54.35 (4th ed. 2001) ("Vacation pay has also been held to constitute 'wages' or 'compensation' by a number of courts."). In addition, we note that the Minnesota Court of Appeals has concluded that " 'an agreement to pay vacation pay to employees made to them before they performed their services, and based upon length of service and time worked, is not a gratuity but is a form of compensation for services.' " *Brown,* 519 N.W.2d at 477 (quoting *Tynan,* 247 Minn. at 177, 77 N.W.2d at 206). We note that this language in *Tynan* was quoting from a New Jersey case as an example of the majority rule in other states; but, we did not explicitly adopt this rule in Minnesota. Nevertheless the court of appeals apparently concluded that this language in *Tynan* was binding. To the extent we have not spoken explicitly on this rule, we now con-

clude that paid time off or vacation pay constitutes wages for purposes of section 181.13(a).[3]

*Is Lee Entitled to Payment for Her Earned but Unused Paid Time Off?*

■ Fresenius argues that because Lee was terminated for misconduct, she is—under the terms of the employment contract—ineligible for payment in lieu of paid time off. This argument is premised on Fresenius's contention that section 181.13(a) does not prohibit the specific provision in Fresenius's employment contract with Lee, which provides that "if your employment is terminated for misconduct, you will not be eligible for pay in lieu of notice or payment of earned but unused PTO [paid time off] unless required by state law."

In support of its position, Fresenius asks us to interpret section 181.13(a) as permitting an employment contract to determine when wages are "actually earned" for purposes of the statute. Fresenius then asserts that Lee is not entitled to the compensation under section 181.13(a) because of the terminated-for-misconduct provision. Lee asserts that this contract provision is prohibited by state law because section 181.13(a) requires employers to compensate discharged employees for wages "actually earned." Lee argues that

her paid time off constitutes wages actually earned under the statute.

■ The term "actually earned" is not defined in the Minnesota Statutes, and we have never had an occasion to interpret this term in light of section 181.13(a).[4] Lee essentially argues that section 181.13(a) creates a substantive right, allowing a terminated employee to use that statute as the basis for a claim for wages, even when the employee's employment contract denies payment for those wages. For the reasons discussed below, it does not appear that the legislature intended to create a substantive right to vacation pay in section 181.13(a). Rather, we conclude that section 181.13(a) is a timing statute, mandating not *what* an employer must pay a discharged employee, but *when* an employer must pay a discharged employee.

■ This interpretation of section 181.13(a) comports with our rule that when a statute "provide[s] for a penalty, [the statute] should be strictly construed." *Chatfield v. Henderson,* 252 Minn. 404, 410, 90 N.W.2d 227, 232 (1958). As we noted in *Chatfield,* section 181.13(a) provides for a civil penalty when an employer fails to pay an employee after discharge upon demand of the employee. *Id.,* 90

**3.** We note that for purposes of other statutes, the legislature has provided a definition for the term "wage" or "wages," intending those definitions to apply only to select statute sections. *See* Minn.Stat. §§ 177.23, subd. 4, 181.66, subd. 4 (2006). We emphasize that our conclusion that paid time off or vacation pay constitutes wages for purposes of section 181.13(a) applies only to this section and not to other statutes where the legislature used the term "wage" or "wages," because in other sections where the term is undefined, it does not appear that the legislature intended the term to encompass earned but unused paid time off or vacation time. *See, e.g.,* Minn.Stat. § 181.101 (2006) ("Every employ-

er must pay all wages earned by an employee at least once every 31 days * * *.").

**4.** The court of appeals has addressed the term "actually earned" under section 181.13(a) in conjunction with alleged unpaid commissions but concluded only that the employment contract "may be considered" in determining whether the commission was owed to a discharged employee. *Holman v. CPT Corp.,* 457 N.W.2d 740, 743 (Minn.App.1990) (concluding that because the employee handbook had no provision on the subject, the issue of whether the employee had actually earned the commissions was a question of fact inappropriate for resolution on a summary judgment motion).

N.W.2d at 232. If we interpreted section 181.13(a) as creating a substantive right for discharged employees to challenge non-payment of wages, employers could be subject to civil penalties for failing to pay wages that the employer had no reasonable way of predicting it owed. Our conclusion that section 181.13(a) must be strictly construed is amplified when we consider that Minn.Stat. § 181.74 (2006) holds employers criminally liable for refusing to provide contracted-for benefits to employees under employment agreements.

Minnesota law concerning vacation pay further supports our interpretation of section 181.13(a). As stated above, Minnesota law does not provide for employee vacation time or pay as of right; rather, the law permits employers to choose whether to grant employees vacation benefits. When vacation benefits are granted, employers have considerable discretion in choosing how and whether to compensate employees for vacation time. If an employer does offer an employee paid time off, what is earned during the specified pay period during which paid time off accrues is not a right to a direct, monetary payment; what is earned is instead a right granted by the employer for the employee to take time off from work in the future but nevertheless be paid, subject to the terms specified in the employment contract that grants paid time off. Paid time off is different than employees' hourly wages, which represent payment for hours that employees have already worked, and employers must pay these wages to the employee within a statutorily-defined time period. *See* Minn.Stat. § 181.101 (2006).

No statute or case law in Minnesota mandates the terms on which paid time off must be offered, or that it be offered at all. As we stated in *Tynan*, employers' "liability as to vacation-pay rights is wholly contractual." 247 Minn. at 177, 77 N.W.2d at 206. Therefore, employers are permitted to set conditions that employees must meet in order to exercise their earned right to vacation time with pay. For example, employers may require employees to request in advance and be granted employer permission to use paid time off. Presumably this is done so that employees are not absent from work at particularly busy times or so that multiple employees are not taking time off concurrently, thereby harming or disabling the employer's ability to function. Fresenius's own handbook terms regarding paid time off impose such conditions: "[a]pproval of requests will be based on the timeliness of your request, authorization by the appropriate supervisor, and the needs of the department."

In other words, employers may offer, and employees may accept, a contract provision that attaches conditions to the right to accrued vacation "wages," whether in the form of actual paid time off or payment in lieu of paid time off. To the extent that paid time off is considered wages, such conditions define those wages. And to the extent that wages in the form of paid time off (or, as here, payment in lieu of paid time off) have been "earned," such conditions define *what* has been earned. Because section 181.13(a) does not itself create a substantive right to vacation pay, it does not prohibit the contractual definition of vacation wages as subject to conditions expressed in the contract.

Indeed, in *Tynan* we acknowledged that contractual terms may validly condition the right to payment in lieu of paid time off. The dissent's emphasis on the "in legal effect choate" language in *Tynan* fails to take into account the court's immediately subsequent discussion of a Michigan case in which the contract provided for compensation in lieu of vacation subject to

two conditions: the employees had to have completed at least 6 months of work and also had to be on the seniority list of the company on December 1. 247 Minn. at 180, 77 N.W.2d at 207 (discussing *Treloar v. Steggeman*, 333 Mich. 166, 167, 52 N.W.2d 647, 648 (1952)). We did not question the enforceability of those conditions, but rather noted, both at the beginning of the discussion[5] and at the end,[6] that the contract at issue in *Tynan* did not contain the second condition present in the contract reviewed in *Treloar*. *See also Simons v. Midwest Tel. Sales & Service, Inc.*, 433 F.Supp.2d 1007, 1011 (D.Minn.2006) (denying a claim under section 181.13(a) for vacation pay after termination because contract conditioned vacation pay on "present and continued employment" and stated "You must be employed at least one (1) week after your Vacation.").[7]

Lee argues that Minnesota case law has never "allow[ed] an employer to refuse to pay a terminated employee benefits that have already been earned and vested." Lee asserts that in essence Fresenius "is proposing that it be allowed to enforce a condition subsequent to payment of earned and vested benefits." We disagree. Fresenius chose to offer the benefit of paid time off, but subject to conditions. Although Lee had earned the right to paid time off, her employment contract provided that her use of and right to payment for paid time off was subject to conditions precedent—not conditions subsequent—of

making a timely request and receiving authorization from her supervisor.

Fresenius also chose to impose conditions on the benefit of payment in lieu of paid time off. The employment contract required Lee to give "proper notice" in order to be eligible for payment in lieu of paid time off, and the contract explicitly stated that "[u]nless otherwise required by state law, if you do not give acceptable notice, you may not be paid for earned but unused [paid time off]." Similar to an employer's decision to place conditions on an employee's use of paid time off while employed, Fresenius presumably has an incentive to place a notice condition on an employee's right to receive payment in lieu of paid time off. Such a notice condition increases the chances that an employee will give notice before resigning by creating the additional incentive of compensating the employee for unused paid time off. Employers presumably value an employee's notice before resignation because it allows them time to meet the needs that less labor will inevitably create.

But Fresenius decided not to offer the benefit of payment in lieu of paid time off to employees terminated for misconduct. We conclude that such a contractual term is not prohibited by statute. Under Minn. Stat. § 181.13(a), the vacation wages that an employee has actually earned are defined by the employment contract between the employer and the employee and cannot be determined through a claim brought

---

**5.** "Section 3.08 makes no such provision as was done in the case of *Treloar v. Steggeman* * * *." *Tynan*, 247 Minn. at 180, 77 N.W.2d at 207.

**6.** "There is no such definite prescribed condition precedent to be found under the provisions of section 3.08 granting vacations with pay in the case at bar." *Tynan*, 247 Minn. at 180, 77 N.W.2d at 207.

**7.** The dissent states that the decision to deny vacation pay in *Simons* was based on a provision that vacation pay accrued at the end of each quarter. But this was an alternative reason. The court first explained that: "The plain language of the contract supports the argument that Simons is not entitled to compensation for any vacation days not taken before her termination because she would not be employed by Central Telephone after those dates." *Simons*, 433 F.Supp.2d at 1011.

under section 181.13(a). In this case, Lee earned her right to use paid time off while she was employed, but she is not entitled to payment in lieu of paid time off because she could not meet the employment contact condition of giving proper notice after she was terminated for misconduct. In accordance with our rule that vacation pay is wholly contractual, it was lawful for Fresenius to place such a condition on Lee's right to receive payment in lieu of paid time off. Fresenius did not violate the terms of its employment contract with Lee and therefore is not liable in this case.[8]

Our interpretation of section 181.13(a) conforms to court interpretations of similar wage-payment statutes in other jurisdictions, where courts have strictly enforced the terms of employment contracts. For example, in Indiana, a statute provides that " 'employees, upon separation from employment, must be paid the amount due them at their next and usual payday.' " *Ind. Heart Assocs., P.C. v. Bahamonde,* 714 N.E.2d 309, 311 (Ind.Ct.App.1999) (quoting Ind.Code § 22-2-5-1). In *Bahamonde,* the Indiana Court of Appeals stated that a terminated employee is entitled to accrued vacation pay unless there is an agreement to the contrary. *Id.* at 311–12. The employer in that case had a policy that denied accrued vacation pay to employees who were terminated for gross misconduct. *Id.* at 312. The court concluded that a terminated employee who sued to recover accrued but unused vacation pay was not entitled to her vacation pay if she was terminated for gross misconduct in violation of the employee's written policy. *Id.* at 312–13.

Similarly, in Maryland, a state statute provides that an employee must be paid "all wages due for work that the employee performed before the termination of employment." Md.Code Ann., [Labor and Employment] § 3–505 (LexisNexis 2006). In *Rhoads v. F.D.I.C.,* a federal district court concluded that a terminated employee was not entitled to accrued vacation pay under Maryland Law because the employee manual in effect at the time of the employee's discharge stated that "[i]f you are terminated for cause by the Association, payment for accrued vacation leave is forfeited." 956 F.Supp. 1239, 1259–60 (D.Md.1997), *rev'd on other grounds,* 257 F.3d 373 (4th Cir.2001).[9]

---

**8.** The dissent would treat earned paid time off as an absolute right to payment, relying on and enforcing rigidly the contractual provisions that define only *when* paid time off is earned or accrued. But the dissent would give no force to the related terms of the contract that define *what* is earned in terms of paid time off or payment in lieu of paid time off—that is, the conditions under which paid time off or payment in lieu of paid time off are allowed. The dissent cites no authority that justifies this differential treatment of the contractual provisions, other than to state that we should not treat wages in the form of paid time off differently than ordinary wages. But wages in the form of paid time off are different as a matter of law, because, as the dissent acknowledges, paid time off is entirely a creature of contract. Here, the contract defines that form of wages as subject to condi-

tions, and Lee concedes that there has been no breach of the contract terms. Finally, the question whether paid time off wages *should* be regulated in the same manner as ordinary wages is a policy matter for the legislature to address. In this respect we note again that section 181.13(a) addresses only the narrow issue of the timing of wage payments after discharge, not the substantive issue of what must be paid as wages. As previously noted, we are required to construe statutes to effect their essential purpose and we may not disregard a statute's clear language. *See Eischen Cabinet Co.,* 683 N.W.2d at 815.

**9.** The Montana Supreme Court reached a different result in *Langager v. Crazy Creek Prods., Inc.,* 287 Mont. 445, 954 P.2d 1169 (1998). In this Montana case, the court interpreted a ruling by the state's board of personnel ap-

Lee suggests that the result we reach is unfair because she worked the necessary hours to earn her right to use Fresenius's paid time off benefit. But any unfairness in Fresenius's terminated-for-misconduct provision is tempered by the facts that (1) Fresenius was not required to offer paid time off as a benefit, (2) Fresenius was not required to offer payment in lieu of paid time off as a benefit, and (3) Lee consented to the conditions placed on her right to receive paid time off and payment in lieu of paid time off by accepting the terms of the employment contract.

We do recognize, however, that the result we reach may appear to be unfair to an employee who believes that she has earned certain wages and believes that her employer has divested her right to those wages based on the employer's unilateral decision to terminate her employment. If this result is unfair, we conclude that the remedy that Lee seeks cannot be found in section 181.13(a), which is a timing statute narrowly tailored to that purpose. Further, if we were to adopt the interpretation for which Lee argues, there could be unintended, collateral consequences for other vacation-benefit policies.

In this regard, our interpretation of section 181.13(a) is buttressed by our statutory mandate to consider "the consequences of a particular interpretation" when ascertaining legislative intent. Minn.Stat. § 645.16. As amicus curiae Minnesota Employment Law Council (MELC) argues, if we interpreted section 181.13(a) to stand for the proposition that an employee had actually earned an absolute right to compensation for paid time off as soon as she had accrued those hours in a given pay period, we would create uncertainty and potentially serious collateral consequences for many employers' vacation-benefit policies. For example, MELC discusses so-called "use-it-or-lose-it" policies, where employers allow employees to accrue and earn vacation time on the condition that the vacation time must be used by a certain date in the future. Under such a policy, if the employee does not use the vacation time by a requisite date, she loses her right to the vacation time. MELC notes that use-it-or-lose-it policies are important to employers for at least two reasons: (1) in many jobs, especially high-stress jobs, employers want to encourage employees to use vacation time, rather than continuing to accrue it, because the

peals, which concluded that "once the decision is made to grant a paid vacation, the employer is obligated to pay that which is earned and due and owing." *Id.* at 1174. The parties differed about whether the vacation pay in question was "earned." *Id.* The employer's personnel manual required that employees "work their regularly scheduled shifts both before and after a scheduled vacation." *Id.* Therefore, the employer argued that because the employee quit before using her accrued vacation time, she did not meet the terms of the manual. Id. The Montana Supreme Court concluded that under Montana law, "vacation pay is earned by virtue of an employee's labor and once it has accrued, it has by definition been earned." *Id.* at 1175. In *Langager* the Montana Supreme Court was reviewing an administrative agency's interpretation of a 1949 opinion issued by

the Montana Attorney General, 954 P.2d at 1173–74; in contrast, we are interpreting a statute, which confines us to rules of statutory construction, *see, e.g.*, Minn.Stat. § 645.16. Finally, we note that the Montana Supreme Court subsequently upheld an employer's policy of paying only 95% of the cash value of paid time off, distinguishing this condition on the value of the benefit, which was present at the time the benefit was earned, from the condition subsequent in *Langager*. *McConkey v. Flathead Elec. Coop.*, 330 Mont. 48, 125 P.3d 1121, 1125–26 (2005). Our holding in *Tynan* that an employer's "liability as to vacation-pay rights is wholly contractual," 247 Minn. at 177, 77 N.W.2d at 206, is antithetical to any interpretation of section 181.13(a) that would prohibit an employer and an employee from agreeing to reasonable conditions on benefits at the time those benefits are earned.

time away from work refreshes and reenergizes employees, resulting in greater employee safety and production; and (2) employers want predictable compensation packages so that they can plan their budget around times when they will owe benefit compensation to employees.

MELC also notes that many employers place a cap on the amount of vacation time employees may accrue, for reasons similar to the use-it-or-lose-it policies. If we reached a different conclusion in this case, and held that employees have actually earned an absolute right to vacation pay as they accrue vacation hours for working each pay period, the legality of both the use-it-or-lose-it policy and the cap-on-vacation-time-accrual policy would be called into question.[10] We do not believe the legislature intended the consequences of such an interpretation when it enacted section 181.13(a), particularly when employers are under no obligation to offer any vacation time or paid time off to employees.

For all the foregoing reasons, we reverse the court of appeals and reinstate the district's court grant of summary judgment in favor of Fresenius.

## II.

▆ Lee argues that if she is not entitled to payment in lieu of her paid time off, this case must be remanded for trial because a genuine issue of material fact exists as to whether Fresenius justifiably terminated Lee for misconduct. Lee asserts that she was attempting to unionize her work group, and all of Fresenius's evidence of Lee's misconduct occurred after she began her union activities. Lee implies that Fresenius terminated Lee not for the alleged misconduct, but because of her union activity.

▆ Fresenius argues that because Lee did not argue that she was wrongfully terminated or that there was a genuine issue of material fact at the district court level, the issue may not be argued on appeal. We agree. Generally, we will not consider an issue raised for the first time on appeal. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988). The only claim Lee filed in this case was a claim to recover payment in lieu of paid time off. Lee did not claim that there is a genuine issue of material fact regarding her termination. In fact, Lee's brief to the district court specifically asserted that this case is not about either "the termination of Susan Lee's employment" or "whether there was misconduct to justify termination," but instead "simply calls upon the court to * * * follow the clear statutory directive of Minn.Stat. Ch. 181.13." Because the issue of whether Lee's termination was justified by her misconduct was not raised below, it cannot be raised on appeal.

We conclude that Lee is not entitled to a remand for trial.

Reversed.

PAGE, Justice (dissenting).

Under Minn.Stat. § 181.13(a) (2006), when an employer discharges an employee, "the wages * * * actually earned [by the employee] and unpaid at the time of the discharge are immediately due and payable upon demand of the employee." The court correctly holds that paid time off constitutes wages for purposes of section 181.13(a).

While it appears, as the court states, that the legislature did not intend to create in section 181.13(a) a substantive right to

---

10. Although the dissent would recognize an absolute right to payment for earned vacation hours, it does not address the consequential abrogation of these common employment policies.

vacation pay, it is obvious from the language of the statute that the legislature intended to create in section 181.13(a) a substantive right to be paid for wages actually earned. Therefore, once it is agreed that paid time off constitutes wages, the critical question in this case becomes whether, at the time Lee was terminated, she had earned the 181.86 hours of paid time off, i.e., the wages, that she had accrued before she was terminated. If the wages were earned before she was terminated, section 181.13(a) required that Lee be paid for them immediately upon termination. If the wages were not earned before Lee was terminated, she is not entitled to be paid for them.

The court is also correct to the extent that it holds that because no Minnesota statute requires an employer to provide paid vacation or paid time off, the provision of paid vacation or paid time off is a matter of contract between the employer and the employee. The court correctly looks to the contract between Fresenius and Lee to determine whether Fresenius agreed to provide Lee with paid time off. Here, the contract is the Fresenius employee handbook, which provides, in relevant part:

Resignation and Termination of Employment

\* \* \* \*

An employee who gives proper notice, as described above, is eligible to be paid for *earned* but unused Paid Time Off (PTO). Unless otherwise required by state law, if you do not give acceptable notice, you may not be paid for *earned* but unused PTO and you may not be considered eligible for re-employment. In addition, if your employment is terminated for misconduct, you will not be eligible for pay in lieu of notice or payment of *earned* but unused PTO unless required by state law.

\* \* \* \*

Paid Time Off

\* \* \* \*

The Paid Time Off (PTO) program allows you to receive paid time off based on individual preferences and varying needs. It may be used for vacation, holiday, short-term sick time, and personal time. Regular full-time and regular part-time employees scheduled to work 20 hours or more per week are eligible for PTO. You *accrue* PTO hours at a set rate per pay period. Your accrual rate depends on your length of service and number of hours worked. There is a maximum amount of PTO that may be *accrued.* If the cap is reached, the additional *earned* time will be added to your Extended Sick Leave (ESL) bank, instead of your PTO bank.

New full-time employees begin to *earn* PTO upon hire at a rate of 7.69 hours per pay period (200 hours, or 5 weeks per year). PTO accrual is pro-rated for part-time employees. Accrual rates increase with length of service at given intervals.

A minimum of three months must be worked before your *earned* PTO can be used, except for a company Fixed Holiday. PTO is paid out at your base hourly rate and does not include overtime, shift differentials, on-call pay or any other type of additional pay.

PTO may be requested and scheduled at any time during the year. Approval of requests will be based on the timeliness of your request, authorization by the appropriate supervisor, and the needs of the department.

(Emphasis added.)

The contract between Fresenius and Lee unequivocally provides that Lee earned paid time off each pay period. Because the 181.86 hours of paid time off at

issue here were, under the terms of the contract, earned each pay period, and because the court correctly holds that earned paid time off is considered wages for purposes of section 181.13(a), that should be the end of the inquiry.

The court grounds its conclusion that Lee was not entitled to be paid after she was terminated for the 181.86 hours of paid time off she had already earned, in part, on the general proposition that

> [i]f an employer does offer an employee paid time off, what is earned during the specified pay period during which paid time off accrues is not a right to a direct, monetary payment; what is earned is instead a right granted by the employer for the employee to take time off from work in the future but nevertheless be paid, subject to the terms specified in the employment contract that grants paid time off.

There are a number of problems with this general proposition.

First, the court is wrong to say that vacation pay or paid time off is strictly a matter of contract and is therefore unaffected by statute. The contract between employer and employee may govern when and how much paid time off is earned— just as the contract between employer and employee may govern how much the employee earns for her labor (provided, for example, that it is at least the statutory minimum and is not discriminatory) and how often she is paid. But if paid time off is wages, once it has been earned Minn. Stat. § 181.13(a) requires that it be paid, just as once monetary wages have been earned Minn.Stat. § 181.13(a) requires that they be paid. Indeed, the contract here explicitly acknowledges that the payment of earned but unused paid time off is subject to applicable state law. In Minnesota, that applicable state law is, in the case of a former employee, section 181.13(a).

Second, the contract in this case imposed no conditions on the employee's right to "earn" paid time off. To "earn" is "[t]o acquire by labor, service, or performance." *Black's Law Dictionary* 547 (8th ed.2004). That is to say, once the labor has been performed, the wages are earned. *See, e.g., Langager v. Crazy Creek Prods., Inc.,* 287 Mont. 445, 954 P.2d 1169, 1175 (1998) (concluding that "vacation pay is earned by virtue of an employee's labor and once it has accrued, it has by definition been earned"). The court's conclusion that "what is earned" once the employee has performed the labor is not "a right to a direct monetary payment," but is instead a right subject to additional conditions imposed at the employer's discretion, flies in the face of the traditional definition of what it means to earn wages and does violence to the concept of what constitutes wages. A conditional right to wages for work actually performed is no right at all.

Third, the court's statement is contrary to the express terms of the contract governing Lee's employment. The Fresenius handbook, as noted above and as drafted by Fresenius, provides that employees "accrue" paid time off "at a set rate per pay period" and that "[n]ew full-time employees begin to *earn* PTO upon hire at a rate of 7.69 hours per pay period (200 hours, or 5 weeks per year)." (Emphasis added.) The handbook does not differentiate between paid time off that merely "accrues" (to be "earned" at some later date) and paid time off that has been "earned" in the first instance. In fact, the handbook uses the terms "accrued" and "earn" interchangeably. While the handbook places some conditions on when an employee may *use* earned paid time off, one example being that an employee must have worked for Fresenius for a minimum of three

months before paid time off can be used, the handbook places no additional requirements on the *earning* of paid time off. For example, the handbook does not provide that an employee must work a certain number of weeks or months before she begins to "earn" paid time off. Nor does the handbook provide that paid time off is earned only at the end of a calendar month or quarter. Rather, the handbook is clear: employees both "accrue" and "earn" paid time off from their first day of employment and continue to earn it each pay period. Because Lee had performed the labor that resulted in the accrual of paid time off, that paid time off had been earned. Indeed, even Fresenius describes the 181.86 hours of paid time off that Lee had accrued at the point her employment was terminated as having been "earned," and in describing the situations that will result in paid time off not being paid the handbook refers only to paid time off that has already been earned but not used. It is also worth noting that the court describes Lee's paid time off as having been "earned."

Fourth, although the court asserts that conditioning the payment of paid time off on whether Lee is terminated constitutes a condition precedent to her earning or accruing the right to be paid for the paid time off, the court is simply wrong. That is clear from the language of the contract: employees "earn" and "accrue" paid time off from their first day of employment. Thus, termination can only occur subsequent to paid time off being earned. The termination condition imposed by Fresenius does not affect the earning or accrual of paid time off. The law does not allow and we would not permit an employer to withhold an employee's paycheck simply because the employee was terminated, even for cause. That raises the question of why we would treat earned wages in the form of paid time off differently. The simple answer is that we should not. To allow Fresenius to divest Lee of paid time off, which Fresenius acknowledges has been earned, is to say that paid time off is not really "wages" at all.

The court states that because "[n]o statute or case law in Minnesota mandates the terms on which paid time off must be offered, or that it be offered at all," "employers are permitted to set conditions that employees must meet in order to exercise their earned right to vacation time with pay." On this point, the court is also wrong. While it is correct that an employer may place reasonable conditions as to *when* an employee can take earned paid time off, just as an employer may determine that the employee's wages will be paid monthly rather than weekly, an employer may not set conditions as to *whether* an employee will be paid wages for work already performed and therefore earned. That is so whether the wages are in the form of a direct monetary payment or paid time off. Tying the payment of wages to a condition, such as whether the employee is terminated, which may or may not arise after the work has been performed, is impermissible.

The court bolsters its interpretation of section 181.13(a) with comparisons to two cases interpreting wage-payment statutes in other jurisdictions that the court characterizes as "similar." But those statutes are readily differentiated. In *Indiana Heart Associates, P.C. v. Bahamonde*, for example, the statute requires only the payment of " 'the amount due' " to the employee. 714 N.E.2d 309, 311 (Ind.Ct.App.1999) (quoting Ind.Code § 22–2–5–1). The definition of "the amount due" is a matter of contract between employer and employee, and nothing in the statute bars the parties from agreeing (by virtue of an employee handbook or otherwise) that an employee can be divested of vacation pay otherwise

earned. Similarly, the Maryland statute at issue in *Rhoads v. F.D.I.C.*, 956 F.Supp. 1239, 1259–60 (D.Md.1997), requires only the payment of "all wages due for work that the employee performed before the termination of employment" without defining when wages are "due." Md.Code Ann., [Lab. & Empl.] § 3–505 (LexisNexis 2006). As a result, Maryland law also allows the employer and employee to contract when wages become "due" and allows the employee to be divested of wages after they are otherwise earned. In contrast to both of these, Minnesota's statute requires the payment of wages "actually earned and unpaid at the time of the discharge." Minn.Stat. § 181.13(a). The statute allows for employer and employee to define when wages are "earned," but does not allow for divestiture of wages once they are earned.

The court also bolsters its interpretation of section 181.13(a) with a reference to *Tynan v. KSTP, Inc.*, 247 Minn. 168, 77 N.W.2d 200 (1956), a case in which we addressed a former employee's entitlement to vacation pay. Tynan was subject to a collective bargaining agreement as a member of the Radio Broadcast Technicians Union. *Id.* at 170, 77 N.W.2d at 202. The collective bargaining agreement in effect on Tynan's last day of work provided that someone in Tynan's position "continuously employed for six (6) months, but less than one (1) year, shall receive a vacation of fourteen (14) consecutive days" and further provided that "[l]ength of service for vacation purposes only shall be determined as of May 1st of each year." *Id.* at 170 n. 1, 77 N.W.2d at 202 n. 1. The collective bargaining agreement automatically renewed on October 1 of each year; Tynan's last day of work was April 5, 1950. *Id.* at 171–72, 77 N.W.2d at 203. The employer argued Tynan was not entitled to vacation pay because he had not fulfilled the terms

of the collective bargaining agreement, namely, that he be employed on May 1, in order to receive vacation pay. *Id.* at 173–74, 77 N.W.2d at 204. We rejected this argument on grounds that once vacation pay was earned under the terms of the collective bargaining agreement, it became "in legal effect choate":

It is clear that, under the collective bargaining agreement in force since 1948, the technicians surrendered all previous holiday-pay arrangements which had been contained in prior union agreements and they received in lieu thereof the right to certain granted vacations with pay conditioned upon fulfilling certain continuous periods of employment. These were 6 months of continuous service within the year covered by the annual agreement in order to become entitled to a vacation of 14 consecutive days and continuous employment as a technician for at least one year during the period of the annual contract in order to become entitled to a vacation of 21 consecutive days. *At the end of each respective period of service, the granted vacation with pay as then established became earned and in legal effect choate.* It would be highly technical, and inequitable, taking into account the apparent conditions under which these granted periods of vacations with pay were entered into as successor provisions to all previous holiday-pay arrangements, to hold that another condition precedent for which the defendant contends exists, namely, that plaintiff's rights would be lost if he was not in the service of the employer on May 1 of the year following the completion of the period of service.

*Id.* at 179–80, 77 N.W.2d at 207 (emphasis added).[1] Similarly in this case, once paid

1. The court contends that my discussion of
*Tynan* "fails to take into account the court's

time off has been earned—and under the terms of the contract it is earned at the end of each pay period—it is "in legal effect choate." [2]

*Simons v. Midwest Tel. Sales & Service, Inc.*, 433 F.Supp.2d 1007 (D.Minn.2006), applies the Minnesota statute at issue here and concludes that the terminated employee was not entitled to be paid, but the facts of that case differ from those here. The contract in *Simons* provided that the employee earned vacation at the rate of 2–1/2

immediately subsequent discussion of a Michigan case in which the contract provided for compensation in lieu of vacation subject to two conditions." But the Michigan case, *Treloar v. Steggeman*, 333 Mich. 166, 52 N.W.2d 647 (1952), involved two conditions precedent to the earning of vacation in the first place: that the employee be on a "seniority list" on December 1, 1947, and that the employee "have completed at least six months' work since December 1, 1946." *Id.* at 167, 52 N.W.2d at 648. Here, there are no conditions precedent on the *earning* of vacation.

We have said that a condition precedent is "any fact or event, subsequent to the making of a contract, which must exist or occur before a duty of immediate performance arises under the contract." *Nat'l City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 176 (Minn.1989). In this case, the employee handbook is the contract, which Lee accepted by virtue of her employment. Once Lee had earned vacation and once she had been employed by Fresenius for at least three months, Fresenius had "a duty of immediate performance" to allow Lee to take her earned vacation and, although Fresenius could impose reasonable conditions on when Lee did so, it could not otherwise have prevented her.

And so what the court characterizes in this case as a condition precedent—that the employee not have been terminated for cause—is a condition subsequent, not a condition precedent, to the taking of or payment for paid time off, the effect of which is to divest Lee of that which she had earned. We have said that forfeitures are not favored and will not be enforced when great injustice would thereby be done and when the one seeking the forfeiture is adequately protected without it. *Warren v. Driscoll*, 186 Minn. 1, 5, 242 N.W. 346, 347 (1932). In this case, Fresenius could have sued Lee for monetary damages due to her alleged misconduct, and thus could have been adequately protected without resorting to confiscation of her earned wages; indeed, that is the implication of Minn.Stat. § 181.79 (2006).

Finally, even if we were to permit a forfeiture here, our case law severely limits what can be forfeited. In *Marsh v. Minneapolis Herald, Inc.*, 270 Minn. 443, 134 N.W.2d 18 (1965), the employee sued his former employer for unpaid overtime; the employer counterclaimed for alleged disloyalty and sought forfeiture of the entire amount paid to the employee during his tenure. *Id.* at 444, 134 N.W.2d at 19. We stated that "[s]ince plaintiff's compensation was payable weekly, each week is an entire and separable contract. Misconduct that goes to the essence of the contract must be established for each week worked before his right to compensation can be defeated or the wages previously paid, forfeited." *Id.* at 448, 134 N.W.2d at 22. Even if a forfeiture were available here, which it is not, under *Marsh* Fresenius would be entitled to withhold only the paid time off earned and unpaid for the pay periods in which it contends that Lee committed misconduct. It could not do what it has done here, namely, confiscate paid time off earned during pay periods in which Lee allegedly committed no misconduct.

2. The court characterizes my position as giving "no force to the related terms of the contract that define *what* is earned in terms of paid time off or payment in lieu of paid time off—that is, the conditions under which paid time off or payment in lieu of paid time off are allowed." If my position gives no force to such things (a position with which I do not entirely agree), it is only because the statute gives them no force. I agree, for example, that the employer can require employees to give reasonable notice before taking paid time off. And I agree, for example, that employers can require new employees to work for a reasonable period of time before taking paid time off. But those are restrictions on *when*, not on *whether*, paid time off is either taken or paid out. On the question of *whether* a former employee must be paid for earned paid time off, the legislature has spoken and the statute controls.

days per calendar quarter: 2–1/2 days on March 31, 2–1/2 days on June 30, 2–1/2 days on September 30, and 2–1/2 days on December 31. *Id.* at 1009. Simons took vacation on January 2, March 29, and April 23; her last day of work was May 6, 2004. *Id.* Thus, the issue was whether vacation days were "earned" at the beginning of the calendar quarter (as the employee advocated) or at the end of the calendar quarter (as the employer advocated). *Id.* at 1011. The court agreed with the employer that under the terms of the contract, vacation was not earned until the end of the calendar quarter, meaning that the employee had already taken more vacation days than she had earned as of her last day of work. *Id.* That is, the employee in *Simons* had no vacation "actually earned and unpaid at the time of discharge" under Minn.Stat. § 181.13(a).[3] In contrast, in this case Fresenius concedes that Lee had paid time off earned and unpaid on the date of the termination of her employment.

The statute is clear: the employer must immediately pay a terminated employee for wages earned and unpaid at the time of discharge. If paid time off constitutes wages, which it does, and if the paid time off has been earned, which in this case it has, then under Minn.Stat. § 181.13(a) an employer must immediately pay a terminated employee for all paid time off earned and unused at the time of discharge. Because the paid time off at issue in this case had been earned, Fresenius's refusal to pay Lee for it violated Minn.Stat. § 181.13(a).

I therefore respectfully dissent.

---

**3.** To the extent the federal court's decision in *Simons* rested on a provision of the employer's vacation policy that purported to divest an employee of vacation pay already earned, it is contrary to Minn.Stat. § 181.13(a). In any event, we are not bound by the federal court's interpretation of the statute.